IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05 CV 160-H

JEANETTE STERLING,

    Plaintiff,

v.

BAKER & TAYLOR, INC.,

    Defendant.

**MEMORANDUM AND ORDER**

    **THIS MATTER** is before the Court on the following motions and memoranda:

    1. the Defendant's "... Motion for Summary Judgment" (document #10) and "Memorandum of Law in Support ..." (document #14), both filed on March 13, 2006;

    2. the Plaintiff's "... Response in Opposition ..." (document #18) filed on April 13, 2006;

    3. the Defendant's "... Reply ..." (document #24) filed on May 9, 2006; and

    4. the Defendant's "... Motion to Strike ..." (document #23) and "... Memorandum in Support ..." (document #25), both filed on May 9, 2006.

    The Plaintiff has not responded to the Defendant's Motion to Strike and the time for doing so has expired. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

    Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's Motion to Strike, but <u>grant</u> its Motion for Summary Judgment, as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action seeking relief for race-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(1) ("Title VII").

### A. Factual Background

The Defendant supplies books, movies, music, and information products to libraries and retailers. It hired the Plaintiff as a Cash Account Representative in its Customer Financial Services department on November 10, 2003. The Defendant employs many such Cash Account Representatives whose primary responsibility is to apply customer payments to the corresponding customer invoices. Cash Account Representatives work on one batch of checks at a time, referred to as "posting cash payments" or "posting batches." Productivity for these Representatives is measured by the average number of batches posted per day. However, a Representative may be given additional credit for posting one batch from a large retailer such as Barnes & Noble or Borders, because of the complexity and size of these batches.

During the Plaintiff's employment with the Defendant, the events leading up to the current lawsuit are best put into perspective through a chronological examination of the facts.

- **November 10, 2003** – the Defendant hired the Plaintiff as a Cash Account Representative.
- **April 2004** – Kristy Rutherford joined the Defendant's Customer Financial Services Department as the Supervisor of the Cash Account Representatives.[1] Scott Senatore, supervisor to both Ms. Rutherford and the Plaintiff, asked Ms. Rutherford to review the performance of each Cash Account Representative. At this time, she concluded that the

---

[1] Ms. Rutherford became the Plaintiff's immediate supervisor, and Ms. Rutherford reported to Scott Senatore, the Director of the Customer Financial Services department. Prior to this time, Mr. Senatore was the Plaintiff's immediate supervisor.

Plaintiff was a low performer with low productivity, exhibited attendance problems, and had violated certain company policies. At the end of her review, she recommended that the Plaintiff be terminated. However, Ms. Rutherford's superiors declined to follow through with the recommendation at that time, and chose instead to give the Plaintiff a chance to improve her productivity.

• **June 2, 2004** – Ms. Rutherford sent an email to all Cash Account Representatives attaching "Guidelines" which all Cash Account Representatives were expected to follow. Of relevance, each Cash Account Representative was expected to post an average of ten batches per day.

• **June 11, 2004** – Ms. Rutherford prepared a written performance warning for the Plaintiff. In the warning the Plaintiff's average postings were calculated as 4.267 batches per day. In addition, her productivity requirements were dropped from 10 batches a day to 7 or 8 batches a day in an effort to help her meet the Defendant's goals for her.

• **June 16, 2004** – the Plaintiff was given the written performance warning in a meeting with Ms. Rutherford and Mr. Senatore. Ms. Rutherford explained to the Plaintiff that if her performance did not improve, she would be subject to termination.

• **June 17, 2004** – An email exchange between the Plaintiff and Ms. Rutherford where Ms. Rutherford is praising the Plaintiff for finishing a Barnes & Noble batch.

• Approximately **June 23, 2004** (or within a week of the June 16 meeting) – the Plaintiff approached Ms. Rutherford and explained to her that she did not agree with the performance warning because she was not being given enough credit for posting large batches, such as Barnes & Noble. The Plaintiff was told to report her concerns to Human Resources. In

addition, after discussing the situation with Mr. Senatore, Ms. Rutherford revised the method for calculating average batches with an account such as Barnes & Noble or Borders. Any Cash Account Representative posting a Barnes & Noble batch would be given credit for 4.5 batches, and 3 batches for a Borders batch. This determination brought the Plaintiff's productivity to 5.33 batches per day.

- **June 24, 2004** – the Plaintiff sent an email to Mr. Scott Senatore asking that the air conditioning be turned on for after hours work – later that night Mr. Senatore commented to her that it was hot. The Plaintiff asked him if he had gotten her email requesting air conditioning. He replied that he asked about air conditioning and was told that "Slaves should be glad they have a place to go all day."

- Sometime after **June 25, 2004** (end of fiscal month) – Ms. Rutherford again calculated the Plaintiff's productivity – for the month of June it was 2.09 batches per day, even with the extra credit for large batches.

- **June 28, 2004** – the Plaintiff made a formal, written complaint to Human Resources about Mr. Senatore's slave comment. The Plaintiff also sent an email to Ms. Rutherford asking her for clarification of her performance requirements. Ms. Rutherford explained that on days when the Plaintiff did not have a Barnes & Noble batch, she should be posting 7 batches per day.

- **July 1, 2004** – Colleen Forness, the Defendant's Human Resources Manager, met with the Plaintiff to discuss her concerns over Mr. Senatore's slave comment.

- **July 2, 2004** – Pam Clark, Mr. Senatore's supervisor and Senior Vice President of Treasury, met with Mr. Senatore to discuss his slave comment to the Plaintiff. Mr. Senatore

4

maintained that his comment referred to the Plaintiff's and everyone else's (including himself) status in the workplace, and had nothing to do with race. Although Ms. Clark did not believe the comment was racially motivated, she told Mr. Senatore that "this type of commentary was inappropriate, regardless of the intent or circumstance."

• **July 7, 2004** – Ms. Rutherford issued a final written warning to the Plaintiff.

• **July 9, 2004** – Ms. Rutherford discussed the final warning with the Plaintiff. The Plaintiff was told that her performance goals would be lowered to 6 batches per day for the month of July, and that in the months following July she would have to post 7 batches per day as a condition of employment.

• Sometime after **July 23, 2004** (end of fiscal month) – Ms. Rutherford again calculated the Plaintiff's productivity – for the month of July it was 4.2 batches per day, even with the extra credit for large batches. Ms. Rutherford again concluded that the Plaintiff should be terminated based on her low productivity.

• **July 26, 2004** – Mr. Senatore asked Ms. Rutherford for recommendations of employees who should be terminated based on performance problems. Ms. Rutherford recommended that the Plaintiff be terminated due to her low productivity. Mr. Senatore relayed the recommendation to Ms. Clark, who reviewed the Plaintiff's performance record, including the two written warnings for repeated failure to meet production goals, and concluded that termination was appropriate.

• **August 2, 2004** – Three new Cash Account Representatives were hired.

• **August 3, 2004** – the Plaintiff was terminated.[2]

• **August 23, 2004** – Ms. Rutherford hired Valerie Robinson, an African-American, to fill the Plaintiff's former position.[3]

• Between **August 3, 2004** and **December 2, 2005** – Ms. Rutherford hired seventeen new Cash Account Representatives – thirteen were African-American, one was Asian, and three were white.

**B. Procedural Background**

On August 17, 2004, the Plaintiff filed an administrative Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). In this Charge, the Plaintiff alleged that she had been discriminated against based on race and retaliation. She described the discrimination as follows:

I. I was hired by the above company as a Cash Accounts Clerk on November 10, 2003. On August 3, 2004 I was discharged.

II. On June 28, 2004 I reported a statement made to me by a Supervisory official to the Human Resources Assistant. The statement reported was, "Slaves should be glad they have a place to go all day." Subsequently, On [sic] August 3, 2004, the Human Resources Manager, Claudette Hampton, told me that they were cutting back and they no longer needed my services. However, at the same time they were hiring new employees.

---

[2]The Plaintiff was offered a severance package in exchange for a release and waiver of claims, including severance pay and a letter of reference dated August 2, 2004, which stated that she was terminated in connection with a reduction-in-force and that her termination was not a reflection of her performance.

Pamela Clark, the Senior Vice President of Treasury, and the person who made the final decision to terminate the Plaintiff, stated that the Defendant had been going through reorganization since approximately July 2003. When an employee was terminated pursuant to the reorganization, that employee was offered a severance package. The decision was made to offer the Plaintiff the same severance package, even though her termination did not fall strictly within the terms of the program, because it was determined that she was terminated due to her low productivity, a performance problem which would not be tolerated under the overall goals of the reorganization.

[3]Two other Cash Account Representatives, both African-Americans, were designated by Ms. Rutherford to post Barnes & Noble and Borders batches.

6

> III. I believe that I was discriminated against because of my race (Black) and in retaliation (704a) for opposing practices made unlawful by Title VII of the Civil Rights Act of 1964, as amended.

On March 14, 2005, the Plaintiff filed a timely Complaint in the Superior Court of Mecklenburg County, North Carolina, alleging claims for unlawful discharge and discrimination based on race and retaliation in violation of Title VII.

On April 18, 2005, the Defendant removed the state court action to federal court. Removal has not been challenged and appears proper.

On March 13, 2006, the Defendant filed its Motion for Summary Judgment, which has been fully briefed as set forth above and is, therefore, ripe for determination.

On May 9, 2006, the Defendant filed its Motion to Strike portions of both the Plaintiff's affidavit and the "Plaintiff's Response in Opposition to Motion for Summary Judgment." Although, as discussed below, none of this evidence is sufficient to create an issue of material fact, the undersigned has considered all of the Plaintiff's evidence and, accordingly, the Defendant's Motion to Strike will be <u>denied</u>.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." <u>See also</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue

for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment.  Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion.  Id. at 255; Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980).  Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Race-Based Discrimination

Title VII makes it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

In order to prove a Title VII wrongful termination claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996), citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988).

To overcome a summary judgment motion based upon direct or indirect evidence of

discrimination, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F. 3d 598, 607 (4th Cir. 1999), quoting Goldberg, 836 F.2d at 848. Accord Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995) (to overcome summary judgment, plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision"). In this case, the Plaintiff has submitted no direct evidence of racial discrimination in the Defendant's decision to terminate her.

Under the alternative proof scheme established in McDonnell-Douglas, if the employee establishes a prima facie case of illegal discrimination (as discussed below), the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802. If the employer does so, the presumption of discrimination "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination. Id. at 804.

The Supreme Court has made clear that the plaintiff at all times "bears the ultimate burden of proving . . . intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997) (en banc), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993) (holding that prima facie case plus disbelief of employer's asserted justification insufficient to survive summary judgment). However, in Reeves v. Sanderson Plumbing Prods., Inc., the Supreme Court held that:

> a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the

plaintiff will always be adequate to sustain a jury's finding of liability.

530 U.S. 133, 147-48 (2000) (emphasis added). Accord Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000) ("In Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so.")

Finally, it is well settled that the perception of the decision-makers alone, not the plaintiff, her co-workers or other third parties, is relevant to the question of discrimination. See, e.g., Tinsley v. First Union Nat. Bank, 155 F.3d 435, 444-45 (4th Cir. 1998); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996); and Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991).

As the Fourth Circuit has stated, in order to establish a prima facie case of discriminatory discharge under Title VII, a plaintiff must show:

> (1) that [she] is a member of a protected class; (2) that [she] suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action [she] was performing at a level that met [her] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class.[4]

King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003), citing, Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999).

Applying these principles to this case, even taking the facts in the light most favorable to the Plaintiff, she has failed to establish a prima facie case of wrongful termination based on race. The Plaintiff is African-American, that is, a member of a protected class, who was terminated, and

---

[4] The Fourth Circuit reiterated this standard in Miles v. Dell, Inc., 429 F.3d 480, 486 (4th Cir. 2005), but recognized that exceptions to the fourth prong of this test exist and should be evaluated in each individual case.

accordingly, she has satisfied the first and second prima facie elements. However, she has not established that her job performance was satisfactory or that her position was filled by a similarly qualified applicant outside the protected class.

Indeed, just from a reading of the Plaintiff's brief it is apparent that her termination stemmed from Ms. Rutherford's belief that the Plaintiff was not performing her job satisfactorily and that the slave comment had nothing to do with the eventual dismissal. The Plaintiff states that shortly after Ms. Rutherford became employed by the Defendant she recommended the immediate termination of the Plaintiff, and "[w]hen [the Plaintiff] was not terminated, Ms. Rutherford began a plan that would ensure her termination." Notably, the Plaintiff never accuses Ms. Rutherford of race-motivated behavior. Instead she argues that her performance could not be the real reason she was dismissed because Ms. Rutherford simply did not understand that the Plaintiff was actually quite good at her job. However, it is clear that whether Ms. Rutherford was right or wrong, she honestly believed that the Plaintiff was not performing up to expectations and documented this in the written warnings she gave to the Plaintiff. The assertion by the Plaintiff that she was an excellent employee, especially in the face of documentation otherwise, is insufficient to create a material issue of fact as to whether she was performing at an acceptable level. Accord Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995) (unsupported speculation insufficient to defeat summary judgment).

In addition, although this factor is not being treated as dispositive, the Plaintiff has not shown that the position was filled by a similarly qualified applicant outside the protected class. In fact, it appears from the evidence that the Plaintiff was replaced by Valerie Robinson, an African-American.

Even assuming arguendo that the Plaintiff had established a prima facie case, the Defendant

11

has offered evidence that Ms. Rutherford's recommended termination of the Plaintiff to Ms. Clark, as conveyed by Mr. Senatore, was based on Ms. Rutherford's good faith belief that the Plaintiff was not performing her job up to communicated standards and had failed to improve when given the chance. Further, Ms. Clark has also stated that she reviewed the Plaintiff's substandard performance and failure to improve and on that basis agreed with the termination decision. Accord Tinsley, 155 F.3d at 444-45 (perception of the decision-maker alone, not the plaintiff, her co-workers or other third parties, is relevant to question of discrimination). In other words, the Defendant has "articulate[d] some legitimate, non-discriminatory reason for its employment decision." McDonnell-Douglas, 411 U.S. at 802. The burden, therefore, shifts back to the Plaintiff to establish that the Defendant's stated reasons are "merely pretextual" and to carry her "ultimate burden of proving intentional discrimination." Runnebaum, 123 F.3d at 164, citing, St. Mary's Honor Ctr., 509 U.S. at 506-11.

For the same reasons that the Plaintiff has failed to establish a prima facie case, she also cannot rebut the Defendant's proffered non-discriminatory explanation for her termination. To the contrary, the circumstances surrounding the Plaintiff's termination, taken in the light most favorable to the Plaintiff, support the Defendant's contention that it did not discriminate against the Plaintiff.

The Plaintiff was given numerous warnings and even lowered standards in an effort to help her keep her job. The initial recommendation for termination and the first written warning both came before the slave comment by Mr. Senatore. The Defendant did address the comment with Mr. Senatore and came to a reasonable conclusion about the issue. Nowhere in the evidence presented by the Plaintiff or the Defendant was there any plausible connection between the comment and the Plaintiff's eventual termination. On the contrary, the evidence established that the Defendant did

12

not believe that the Plaintiff was performing up to standard, the Defendant documented this belief and supported it with actual performance numbers, it relayed its concerns to the Plaintiff (letting her know that failure to improve could result in termination), and, finally, it even lowered its documented standards in an effort to help the Plaintiff keep her job. It would be an extraordinary assumption on these facts to conclude that the Plaintiff was dismissed because of racial animosity toward her.

In short, where the Plaintiff has failed to demonstrate the existence of a prima facie case of unlawful discrimination or to raise a material issue of fact as to whether the Defendant's stated reason for her termination was "pretextual," the Defendant's Motion for Summary Judgment must be <u>granted</u> as to the Plaintiff's Title VII claim for wrongful termination based on race.

**C. Retaliation Claim**

In addition to prohibiting harassment or discrimination in the workplace on the basis of race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce rights under the Act. 42 U.S.C. § 2000e-3(a).[5] To establish a prima facie case of retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the

---

[5] Title 42 U.S.C. §2000e-3(a) specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

13

adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See also Hopkins, 77 F.3d at 754; and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296. Accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence . . . Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." Childress v. City of Richmond, 907 F. Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (*en banc*), cert. denied, 118 S.Ct. 2322 (1998). Accord Mayo v. Kiwest Corp., 898 F. Supp. 335, 337 (E.D.Va. 1995).

14

For argument's sake, the undersigned will assume that the Plaintiff engaged in "protected activity" prior to her termination, that is, she complained about the racially offensive comment. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or . . . opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). It is also undisputed that subsequent to the Plaintiff's complaint, the Defendant took an adverse employment action against her when it terminated her employment. The Plaintiff's ability to establish a prima facie case depends, therefore, on whether she can establish a causal link between her protected activity and the termination.

In this case, the Plaintiff's evidence clearly fails to create a genuine issue of material fact as to this final element. The initial recommendation for termination came from a review of the Plaintiff's performance a few months before the protected activity even took place. The Plaintiff makes much of the fact that she thinks the review incorrectly evaluated her performance, but even if the Plaintiff is absolutely correct in her assertion that Ms. Rutherford did not understand her job, this is irrelevant to a Title VII claim. The Plaintiff must prove that Ms. Rutherford recommended her for termination to retaliate against her for reporting Mr. Senatore's comment – at the most she has attempted to convince the Court that Ms. Rutherford was simply wrong in her evaluation of the Plaintiff's performance. Nothing in the evidence tends to show that Ms. Rutherford would have evaluated the Plaintiff's performance any differently had Mr. Senatore never made such a comment, or had the Plaintiff never reported it to Human Resources.

Much to the contrary, the evidence establishes that the Defendant had a legitimate, non-discriminatory reason for terminating the Plaintiff's employment – namely, for not performing up to standards, even after the standards were lowered for her.  Thus, for the same reasons she cannot establish a prima facie case of retaliation, the Plaintiff cannot carry her ultimate burden of showing that the Defendant was actually motivated by an unlawful retaliatory purpose.  Accord Brewer v. Dana Corp., 205 F. Supp. 2d 511, 518-19 (W.D.N.C. 2002) (finding that violation of a work rule is a legitimate, nondiscriminatory reason for discharge).

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must and will be granted.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The Defendant's ". . . Motion to Strike . . ." (document #23) is **DENIED**.

2. The Defendant's ". . . Motion for Summary Judgment" (document #10) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE.**

3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: June 6, 2006

Carl Horn, III
United States Magistrate Judge